**FIRST NAT. BANK OF EL PASO v. INTER-NATIONAL SHEEP CO. et al.**

No. 2373.

Court of Civil Appeals of Texas. El Paso.

May 22, 1930.

Rehearing Denied June 12, 1930.

Turney, Burges, Culwell & Pollard, of El Paso, for appellant.

R. F. Burges, of El Paso, for appellees.

WALTHALL, J.

The First National Bank of El Paso, Tex., brought this suit against the International Sheep Company, a corporation, of which C. F. Morse is president, Henry T. Bowie, C. M. Newman, J. Krakauer, James A. Dick, and John C. McNary; the said Bowie, Newman, Krakauer, and Dick being the appellees herein.

About the 1st of April, 1920, appellees Bowie, Newman, Krakauer, and Dick, then holding stock in the International Sheep Company, sold their stock and ceased to be interested therein, and received in payment for their interest three notes, executed by the International Sheep Company, each dated April 1, 1920, one note in the principal sum of $10,000, and two notes each in the sum of

$5,000, payable to Robert L. Holliday, trustee, all notes bearing 8 per cent. interest. The three notes were transferred by Trustee Holliday, without recourse, to the appellant, First National Bank of El Paso.

On April 8, 1920, appellees, together with John C. McNary, executed and delivered to the appellant bank the following instrument made the basis of this suit:

## "Continuing Guaranty.

"In consideration of the First National Bank of El Paso, Texas, at my request giving or extending terms of credit to International Sheep Co., hereinafter called debtor, I hereby give this continuing guaranty to the First National Bank, its transferrees or assigns, for the payment in full together with all interest, fees and charges of whatever nature and kind, of any indebtedness, direct or contingent, of said debtor to said First National Bank up to the amount of Twenty Thousand Dollars whether due or to become due and now existing; and I hereby bind and obligate myself, heirs and assigns, with said debtor, jointly and severally, for the payment of the said indebtedness precisely as if the same had been contracted and was due and owing by me in person, hereby agreeing to, and binding myself, my heirs and assigns, by all the terms and conditions contained in any note or notes signed or to be signed by said debtor, making myself a party thereto; and, waiving all notice and all pleas of discussion and division, I agree to pay upon demand at any time to said Bank, its transferrees or assigns, the full amount of said indebtedness up to the amount of this guaranty, together with interest, fees and charges, as above set forth, becoming subrogated in the event of payment in full by me to the claim of said Bank, its transferrees or assigns, together with whatever security it or they may hold against said indebtedness. The Bank may extend any obligation of the debtor one or more times and may surrender any securities held by it without notice or consent from me and I shall remain at all times bound hereby, notwithstanding such extensions and/or surrender.

"It is expressly agreed, that this continuing guaranty is absolute and complete, and that acceptance and notice of acceptance thereof by the Bank are therefore unnecessary and they are hereby expressly waived.

"In faith whereof, I have hereunto signed my name on this the 8th day of April, 1920.

"(Signed) John C. McNary,
"Henry T. Bowie,
"C. M. Newman,
"J. Krakauer,
"James A. Dick."

The petition represents that the indebtedness above described aggregating the sum of $20,000, though extended and renewed many times, has never been paid, but is still a valid, subsisting obligation due from the defendant International Sheep Company to plaintiff (appellant); that said indebtedness is past due and unpaid, save and except the sum of $800 paid on the principal by the International Sheep Company; that said indebtedness bore now and at all times bears and has borne 6 per cent. interest as in said notes, and 10 per cent. additional attorney fees if placed in the hands of attorneys or collected by suit; that plaintiff is the legal and equitable owner and holder of said indebtedness; alleges demand and refusal to pay, and that same has been placed for collection in the hands of attorneys, naming them; that 10 per cent. is a reasonable fee and one contemplated by the guarantors; that John C. McNary is now dead and has never been made a party defendant. The petition in addition to the above, and, in the alternative, states the legal liability of the defendant guarantors, which we need not state more fully at this time, and asks judgment against the International Sheep Company for the principal, interest, and attorney fees of the said notes, and judgment jointly and severally against the other defendants for the amount, to, wit, $19,800, together with 6 per cent. interest and attorney fees.

Defendants (appellees) Bowie, Newman, Krakauer, and Dick answered by general demurrer, general denial, special denial to the effect that they executed the guaranty instrument for the purpose or consideration of inducing the plaintiff bank to give or extend terms of credit to the International Sheep Company, but did sign said guaranty contract for the purpose of guaranteeing the payment of certain specified notes aggregating $20,000 executed by the International Sheep Company, negotiated to plaintiff bank, and that before signing said guaranty instrument they amended said printed form so as to guarantee the then existing indebtedness of the International Sheep Company to the plaintiff bank, same being that evidenced by said notes transferred to the bank by the defendants and John C. McNary, and no other indebtedness; that they were no longer interested in the financing of said International Sheep Company, or its financial management; that said notes so guaranteed were secured by a mortgage executed by the International Sheep Company of date April 2, 1920, to secure the payment of said notes for the benefit of defendants and McNary, a copy of the mortgage made a part of the answer. The answer further states that subsequent to the execution of the guaranty contract the said three notes were fully paid by the International Sheep Company, and that said mortgage released on May 8, 1923, by the trustee. Defendants further answer that, if in fact the whole of said indebtedness was not paid as alleged, in any event

plaintiff bank extended the International Sheep Company a large line of credit and did lend to it large and additional sums of money without the knowledge and consent of defendants, and, after the release of said mortgage taken by them to secure said guaranteed indebtedness, plaintiff bank took a mortgage upon the identical property of the International Sheep Company to secure said new and increased line of indebtedness extended to the International Sheep Company, and defendants say that, if the whole of said indebtedness was not in fact paid, same was merged into the larger indebtedness and absorbed into said larger notes of the International Sheep Company.

Defendants say that in 1922 the International Sheep Company transferred its banking account to plaintiff bank, and obtained loans of large sums of money from plaintiff which loans were continued, extended, renewed, partially paid, and extinguished, and, to the present time, constituting a running account; that large payments were made by the International Sheep Company upon said account, including said guaranteed indebtedness.

Defendants say that, if any part of said original guaranteed indebtedness is unpaid, it is due solely to the laches and negligence of plaintiff bank in not applying same out of the sums of money paid as stated.

Defendants say that by reason of the matters stated, and by releasing the said mortgage to defendants and taking to itself a mortgage upon the identical property to secure other indebtedness due plaintiff, deprived defendants of the security given them, and that by reason thereof plaintiff is not entitled to recover of defendants.

Defendants plead the bar of the four years' statute of limitations of this state, and of the six years' statute of New Mexico.

Plaintiff, by supplemental petition, excepted generally and specially to defendant's answer; made general denial; admits the renewals and extensions of said indebtedness, but denies that any portion of it has been paid; avers that, if there appears of record a release of any securities, as in the answer stated, same was released in error; that a new mortgage was duly executed prior to any such release of the deed of trust or mortgage, and that the purpose of the release, if any release was made, was to release the old deed of trust, but not the new; that under the guaranty contract plaintiff was authorized without notice to renew and extend the indebtedness made the basis of the guaranty, and that such was done; that the advances made to the International Sheep Company had no relation to the guaranteed indebtedness; and the payments made by the International Sheep Company were in satisfaction of said advances and for the running expenses of the sheep ranch, and were so applied; there was never a request from any source that payments be applied to the guaranteed indebtedness.

C. F. Morse, as amicus curiæ, filed an affidavit, to the effect that he is the president of the International Sheep Company; that it is a New Mexico corporation; that it transacts no business in Texas and has no office in this state; has never taken out license to do business in this state; that the court is without jurisdiction to try the cause as to it.

The case was tried to a jury and submitted on special issues.

On the issues submitted the jury found:

1. On the 5th day of April, 1923, it was not the mutual intent of the First National Bank and the International Sheep Company that the note for $20,000 given by the International Sheep Company to the First National Bank on that date should discharge and liquidate the indebtedness evidenced by the three notes held by the First National Bank payable to Robert L. Holliday, dated the 1st day of April, 1920, two in the sum of $5,000 and one in the sum of $10,000.

2. The payments made by the International Sheep Company to the First National Bank subsequent to May 15, 1923, were obtained from the sale by said sheep company of property described in the chattel mortgage of May 15, 1923, and other chattel mortgages from the sheep company to the bank, bearing date May 15, 1923, and which have been introduced in evidence.

3. In the giving and taking of the notes from the International Sheep Company to the First National Bank subsequent to the note dated April 5, 1923, for $20,000, it was not the mutual intention that the same, or any of same, should discharge and liquidate the debt evidenced by the three notes held by the First National Bank, payable to Robert L. Holliday, of date April 1, 1920, two in the sum of $5,000 and one in the sum of $10,000.

Supplemental issue A. The $20,000 made the basis of the guaranty is unpaid by the International Sheep Company.

Each of the parties filed motion for judgment.

The trial court took the case under consideration to a later day in the term at which time the motion of plaintiff was overruled, and the motion of defendants was granted and judgment entered that plaintiff take nothing by its suit, to which action of the court, in overruling its motion for judgment and entering judgment for defendants, plaintiff excepted and gave notice of appeal.

The trial court made and filed findings of facts and conclusions of law, holding, in effect, that the guaranty contract had been

discharged as a matter of law, as indicated in the court's conclusions of law, as follows:

### "Conclusions of Law.

"1. A guarantor is bound to the extent and in the manner as provided in the instrument evidencing his contract. The provision in the contract of guaranty in question herein gave the bank the power to extend the date of the maturity of the indebtedness of the Sheep Company then existing, but as against the guarantors did not give the power to enlarge the obligation of the Sheep Company.

"2. The taking of new notes from the Sheep Company, the consideration of a part of which was $20,000.00 original indebtedness, and making it all bear ten per cent interest per annum, had the legal effect of discharging the guarantors. The guarantors guaranteed an obligation of the Sheep Company which bore eight per cent, and for the payment of which interest they were legally bound. The changing of the rates of interest was a material change in the contract guaranteed.

"3. A material change in the contract of the principal discharges the guarantors.

"Let judgment be entered for the defendants," which was done.

Plaintiff bank filed its motion for a new trial, which was overruled, to which the bank excepted, gave notice, and has perfected this appeal.

### Opinion.

The first and the ninth propositions submit that, the jury having found that the $20,000 indebtedness, made the basis of the guaranty, is unpaid by the International Sheep Company, the trial court erred in failing to enter judgment conformably to the facts so found. The remaining propositions refer to the proper construction to be given the guaranty contract made the basis of the bank's suit.

The case has been fully pleaded and the facts fully developed. There is no dispute as to the facts which necessarily control the disposition to be made of the case. On the trial the trial court apparently did not reach the conclusion he thought to make of the case until the case had been submitted to the jury; otherwise the court evidently would have instructed a verdict. On the filing of the motions for judgment the court took the matter of the judgment to be rendered under further advisement and consideration, and reached the conclusion as indicated in the court's subsequent findings of fact and conclusions of law set out above.

A few of the court's findings we might mention with some additional undisputed. facts in the record in explanation of the court's findings and conclusions. Subsequent to the execution of the guaranty a number of transactions were had between the sheep company and the bank running over a period of several years, in which the bank extended credit to the sheep company by notes and renewal notes to the extent of many thousand dollars, as stated later herein, in excess of the $20,000, and in which notes and renewal notes the $20,000 indebtedness was merged and made a part of. The record shows that during the several years the indebtedness guaranteed was not kept so as to distinguish it from the general credit extended the sheep company by the bank, except that for the first few years some note was made of it in the series of mortgages given to secure the entire indebtedness, and in later years nothing was done in renewing the indebtedness, either in the new notes or in the securities taken, to indicate or distinguish the guaranteed indebtedness from the additional credit given.

It might be said that, so far as the record discloses, the transactions between the sheep company and the bank ceased with the payment by the sheep company of one of two $50,000 notes, and leaving one $50,000 note unpaid, upon which this suit is brought, and in which note no reference is made to the guaranteed indebtedness as being included therein.

If the indebtedness guaranteed is still in force and unsatisfied, it necessarily must be in and a part of the unpaid $50,000 note. The bank in its propositions insists as stated that the court should have sustained its motion for judgment and entered judgment on the facts found by the jury; and further contends that the bank was authorized under the guaranty to do just what the bank did in extending and enlarging the sheep company's indebtedness and taking new notes and including the guaranteed indebtedness in such new notes, with such rate of interest as the bank and the sheep company might agree upon, and without in any way affecting the liability of the guarantors by such renewal notes, or by applying thereto any payments made by the sheep company.

The conclusion of law reached by the trial court on the facts the court found is to the effect that the taking of new notes from the sheep company, the consideration of a part of which was the $20,000 indebtedness guaranteed, and making the unpaid indebtedness bear 10 per cent. interest, while the three notes constituting in the aggregate the $20,000 guaranteed bore 8 per cent. interest and made no express provision for an increased rate of interest on all past-due interest, is such a material change in the guaranty as to discharge the guarantors.

If the trial court's conclusion on the facts found by the court is sustained, the facts found by the jury are immaterial, and the guarantors are discharged as a matter of law, and, had the court so concluded before submitting the case to the jury, it was the

duty of the court to instruct a verdict for the guarantors.

The provisions of the guaranty are: First, the guarantors guaranteed payment in full of any indebtedness direct or contingent of said debtor to the bank up to the amount of $20,000, whether due or to become due, and now existing; second, they agreed and bound themselves by all the terms and conditions contained in any note or notes signed or to be signed by the debtor (sheep company) and made themselves a party thereto; third, they waived all notice and all pleas of discussion and division and agreed to pay on demand the full amount of "said indebtedness up to the amount of this guaranty together with interest fees and charges"; fourth, the bank may extend any obligation of the debtor one or more times and may surrender any securities held by it.

The question presented, first, on the trial court's findings and conclusions, is: Did the change in interest in' the new note or notes, as found by the trial court, from that borne by the indebtedness guaranteed in the three notes have the effect to discharge the guarantors?

The guarantors placed no such limitation in the guaranty contract, but instead expressly agreed and bound themselves by all the terms and conditions of any note or notes signed or to be signed by the sheep company to the bank, and the only limitation in the guaranty is as to the amount of $20,000, for which they agreed to be liable at all events. The interest in any subsequent note or notes of the sheep company involving the indebtedness guaranteed, as we view the guaranty, was to be calculated on the rate of interest expressed in any subsequent note. We think the trial court was in error in his conclusion from his findings as to the effect on the liability of the guarantors by reason of the charge in the rate of interest in the subsequent note, and the judgment based on such conclusions. We agree with the appellees' insistence that a contract of guaranty is strictly construed, and that any material alteration in the indebtedness guaranteed, made without their consent, will release the guarantor. All of the authorities so hold. We need not review them. But, as here, where the guarantors, in advance, expressly in the guaranty contract waive notice, and agree and bind themselves by all the terms and conditions contained in any note or notes, and by agreement made themselves party to such note or notes, the courts must construe and give effect to the guaranty as made. To do otherwise would interrupt and make uncertain such commercial transactions.

We will now discuss appellee's counter assignments of error. The first is to the effect that the court erred in not instructing a verdict for appellees as requested, for the reason that the undisputed evidence showed that the guaranteed contract had been voluntarily altered by the bank without the knowledge or consent of the guarantors as to the amount of the indebtedness and the rate of interest which the same bore, and the date when payable and the payee to whom payable, by releasing the chattel mortgage executed to secure the payment of said indebtedness to the guarantors.

We have concluded, as above stated, that the guaranty contract would probably authorize what was really done by the bank in taking an increased interest on renewal notes, and we overrule that counter assignment.

The second counter assignment submits error in refusing to instruct the jury in favor of appellees as requested, for the reason that the undisputed evidence showed that the bank took and received from the sheep company a mortgage to secure the payment of the guaranteed indebtedness, and subsequently received the proceeds from the sale of the mortgaged property sufficient to pay the indebtedness, which it was its duty to apply to the payment thereof.

We will discuss this second counter assignment in connection with the third. The third counter assignment reads:

"Third: The trial court erred in refusing to peremptorily instruct the jury to return a verdict for the defendants, as requested by them; for the reason that the indebtedness guaranteed by them was merged into a general running bank account by the plaintiff, and payments were made upon said running account far in excess of the amount of said indebtedness which was the oldest item of said running account, and no application of such payment having been made by either the debtor or the payee, the law applied the same to the extinguishment of such oldest indebtedness."

We here make a more extended statement of the uncontroverted evidence.

The account of the sheep company with the bank is set forth in full and in detail in six sheets, comprising twelve pages in the statement of facts. In it are set forth each and every one of the series of notes, beginning with the original three notes comprising the indebtedness guaranteed, and including the final $50,000 note evidencing the unpaid balance due the bank on said account. J. M. Mandeville, assistant cashier of the bank, and F. M. Murchison, vice president of the bank, each testified to the correctness and completeness of the account and explained how the account was debited when a loan was made to the sheep company and how the account was credited when a payment was received from the sheep company, and explained that at more or less regular intervals, every six months, during the years from 1922 to 1928, a balance would be struck and new notes exe-

cuted to cover the balance of indebtedness, and a new chattel mortgage and deed of trust would be taken to secure these notes.

After the bank purchased the three notes aggregating the $20,000 guaranteed by appellees, on October 25, 1920, the bank received a payment on the note of $800.00. On April ——, 1923, the bank merged the balance of the three notes into one note for $20,000, thus increasing the principal of the obligation $800. On June 17, 1924, the $20,000 was merged with other notes, one for $50,000, one for $56,000, and one for $5,400, thus increasing the principal indebtedness to $111,400; at this point the $20,000 disappears from the account, and no such note ever appears therein as a separate and distinct indebtedness.

On November 12, 1924, after credits on the above three notes were made and notes canceled, two notes of $50,000 each were taken by the bank evidencing the then total indebtedness. These two notes bore interest at 10 per cent., as did the other notes of the series.

On July 13, 1926, the two notes last above described were renewed in full for $50,000 each, bearing 10 per cent interest from maturity. Witness Murchison testified: "This $20,000.00 was at one time an integral part of two notes for $100,000.00 * * * I will say that there is nothing on the face of the notes in any way to distinguish any one $20,-000.00 of that indebtedness from any other portion of the indebtedness that is secured by that mortgage deed. I think it is correct to say that it is simply a part of one of those two larger notes." No trace of it could be made through the mortgage or deed of trust after December, 1926. After that date about $100,000 was paid on the running account; $50,000 was paid April 10, 1923, as one item at one time. All of these successive notes were secured by chattel mortgage and deed of trust on all assets of the sheep company, including the property originally pledged to secure the guaranteed notes.

On December 30, 1926, the two notes were again renewed in full, stipulating for 10 per cent. interest and secured as before, and at that time a new note in the sum of $16,650 was taken on like terms and secured in like manner.

On June 15, 1927, balance of account was struck and three notes, two for $50,000 each, and $15,510 were taken.

On April 10, 1928, one $50,000 was paid.

The record shows that the whole indebtedness, including the $20,000, was put into the new notes, and the securities were taken to secure all of the indebtedness alike.

The sheep company at no time requested the application of any payment to the discharge of the guaranteed indebtedness, other than the $800.

Witness Murchison testified: "This guaranty was never presented to any one of these defendants or any demand made on them until about July, 1928, I don't recall the exact date. The reason no request or demand for payment was ever made of any of these defendants, in the eight or more years that intervened between April, 1920, and July, 1928, was because I did not know that we had the guaranty until about that time. * * * There is a $50,000.00 note in the Bank now, owing by the International Sheep Company, and all of the sheep have been sold. The $20,000.00 that came into the Bank in 1920, is part of that $50,000.00 note. * * * From the 16th day of December, 1924, down to April, 1928, the indebtedness was represented by two $50,000.00 notes that were carried, so far as these transactions were concerned. Right on down, covering a period of about four years, there were in existence two $50,000.00 notes, obviously and from the evidence the $20,000.00 in dispute was in one of these notes, and the remainder of that note and all the other notes represented advances made by us to the Sheep Company. On the 10th of April, 1928, one of these $50,000.00 notes was paid, which left in the Bank the $50,000.00 which is still there. The $20,000.00 indebtedness is part of the $50,-000.00 note we now hold. * * * I don't know which note contained the $20,000.00. * * * Yes, I do know, too, which note contained the $20,000.00. I know that because we wouldn't release the $20,000.00; why should we? * * * I believe the notes (the two $50,000.00 notes) are identical in form. * * * I absolutely did not intend to release the $20,000.00. * * * As to whether it was purely a mental intention to apply it (the payments made by the Sheep Company) to the part we advanced to buy sheep or operate the ranch and not to segregate indebtedness,—I will say it was an actual intention to do so. There is nothing in the notes to show, except we intended it should extinguish that portion of the $50,-000.00 to buy sheep or carry on the operation."

We have transcribed but a small part of an extensive examination and cross-examination of the witness, Vice President Murchison, but sufficient we think to show that the guaranteed indebtedness was merged into a large general running bank account, that the guaranteed indebtedness could not be distinguished from any other part of the general indebtedness more than to know that it was included as a part of it, and to show that periodical payments were made upon the general indebtedness far in excess of the guaranteed indebtedness, that the guaranteed indebtedness was the oldest item of indebtedness, and that no application of payment to the indebtedness had been made by the debtor other than the payment of the $800, or the

payee, other than as stated by the witness Murchison as to his intention not to apply the payment and thus cancel the $20,000 when other payments were made, and especially the $50,000 was paid on April 10, 1928. We have not referred to the various renewals of the mortgages, being of the opinion that the mortgages followed the debts they were intended to secure, and that the bank owning the notes. and the sheep company, the debtor, had the right to write the mortgages as they saw proper.

Mr. Murchison on July 25, 1928, for the first and only time, notified appellees that the sheep company was not able to pay the $20,000, and called on appellees to meet their guaranty. The sheep company had then completely exhausted their resources; the sheep had been sold, and the last payment made in taking up one of the two $50,000 notes as stated. Mr. Murchison's evidence, as above quoted, indicates that he did not know until about July, 1928, that the bank had the guaranty. We have concluded that even at that time no specific act of the bank is shown, other than an actual intention to do so, which evidences an appropriation of the payment made by the sheep company to the $50,000 note, which did not include the $20,000 indebtedness as an integral part of it. The record does not show that any kind of entry was made showing an appropriation of any payment to the general indebtedness of the sheep company, as against the guaranteed indebtedness, nor an intention to make such appropriation. In the absence of anything to distinguish one debt from another, it would be impossible to say what debt was paid.

The question then, in view of the record, is presented: Do the above facts discharge the guaranteed obligation as a matter of law? If not, the liability of the appellees would be the $19,200 unpaid principal, and interest on the same at 6 per cent. from the 16th day of April, 1928, the date of the note sued on, and 10 per cent. of the principal as attorney fees.

■ We have concluded that the guaranteed obligation of appellees has been discharged by the voluntary payments made by the debtor, the International Sheep Company.

■ With slight changes in the language used by the law book writers, and the courts, the rule is well settled that a debtor who owes his creditor money on distinct and separate accounts, or debts, may direct his payments to be applied to either as he pleases. If the debtor omits to make such voluntary appropriation, then the creditor has the right to apply the payments to such debts due him by the debtor as he may choose. The right of the debtor and the creditor, however, is only a right, and must be exercised before a controversy has arisen concerning such payments. Where the right of appropriation of payment has not been exercised by either

debtor or creditor, the law steps in and makes the appropriation according to the equity and justice of the case. Taylor v. Coleman, 20 Tex. 772, 766; Matossy v. Frosh, 9 Tex. 610. In Friedman-Shelby Shoe Co. v. Davidson (Tex. Civ. App.) 189 S. W. 1029, 1033, it is said that, where no application of payment has been made by either "the law will apply the payment according to priority of time, and this rule will apply where one item is better secured than the other."

In Phipps v. Willis et al., 11 Tex. Civ. App. 186, 32 S. W. 801 (writ refused) the court said: "We deduce the general rule to be that, where there is a running open account between parties, and no appropriation is made by either, the law will apply the payments according to priority of time, the first item on the credit side going to discharge or reduce the first item on the debit side; and this rule will be applied, though one item be better secured than another," citing cases to which we refer without copying them.

In the same case the court says, and which we think applies here: "But, apart from the rule which we have been discussing, in the opinion of the writer there is another and stronger reason why the payments made by the debtor, Phipps, should be applied to that part of the account guaranteed by the appellant. That reason has its foundation in the nature of the contract of guaranty. A guarantor is not directly, but only collaterally, bound for the debt he guaranties. He is not liable until the debtor makes default, and, generally, not until the creditor has used due diligence to collect from his debtor. But, if it be conceded, as seems to be assumed by appellee, that he was by the terms of the guaranty given by appellant relieved from the usual diligence required of the creditor, upon default made by the debtor, appellee should not be allowed to say that the failure of Phipps to instruct him to which part of the account the payments should be applied is equivalent to default of payment; when he had in his hands moneys received from Phipps, subsequent to the execution of the guaranty, more than sufficient to discharge both the amount guarantied and the previous indebtedness of Phipps. Appellee, in good conscience, could do nothing to prevent Phipps from discharging his obligation to the appellant, to relieve her from liability on the guaranty; and good faith required, if appellee chose to extend credit to Phipps, after the expiration of the guaranty, that all moneys received from him should be first applied to that part of the account guarantied by appellant."

In United States v. Kirkpatrick, 9 Wheat. 720, 737, 6 L. Ed. 199, Mr. Justice Story in delivering the opinion of the Supreme Court, where both debtor and creditor have omitted to make the appropriation of payment, says:

520

"The law will apply the payments, according to its own notions of justice. It is certainly too late for either party to claim a right to make an appropriation, after the controversy has arisen, and a fortiori at the time of the trial. In cases like the present, of long and running accounts, where debits and credits are perpetually occurring, and no balances are otherwise adjudged than for the mere purpose of making tests, we are of opinion, that payments ought to be applied to extinguish the debts according to the priority of time; so that the credits are to be deemed payments pro tanto of the debts antecedently due."

Here the entire indebtedness of the sheep company, including the guaranteed indebtedness, was embraced in the same note or notes and secured by the same mortgages and deeds of trust. In Parsons' work on Contracts, vol. 2 (9th Ed.) p. 633, it is said: "And, in general, the doctrine of appropriation, and the right of election, apply only where the debts or accounts are distinct in themselves, and are so regarded and treated by the parties. Where the whole may be taken as one continuous account, payments are generally, but not universally, applied to the earliest items of the account."

In Dunnington v. Kirk, 57 Ark. 595, 22 S. W. 430, the Supreme Court of Arkansas quoted with approval the above, and stated that: "A running account, although composed of items partly secured and partly not, is so far one debt that the creditor has no election, in the absence of any appropriation by the debtor, as to which item he will credit; the payment going by force of law to the oldest items."

The opinion is already too lengthy. We only refer to a few cases we have reviewed discussing the subject here being considered: Chitty on Contracts, 1116; Story on Equity Jurisprudence, vol. 1, § 459 b and c; Devaynes v. Noble, 1 Mer. 604, known as Clayton's Case, decided in 1816, and relating to a banker's running account. In that case Sir William Grant, Master of the Rolls, said: "In such a case there is no room for any other appropriation than that which arises from the order in which the receipts and payments take place and are carried into the account. Presumably, it is the sum that is first paid in that is first drawn out. It is the first item on the debit side of the account that is discharged or reduced by the first item on the credit side. The appropriation is made by the very act of setting the two items against each other. * * * You cannot take the account backwards, and strike the balance at the head instead of at the foot." Willis & Bro. v. McIntyre, 70 Tex. 34, 7 S. W. 594, 8 Am. St. Rep. 574, is in point.

■ We think we need not discuss the question of whether the guaranty is a continuing guaranty or not. The appellant sues for $20,000 less the credit of $800, and interest, and attorney fees. The application of the payments made, as discussed, would apply, we think, in either event.

■ The only question remaining is the judgment to be entered here.

The matters of fact have been well pleaded and fully developed. There is no matter of fact to be ascertained, or damages to be assessed, or any matter to be decreed uncertain, referred to in the latter or exception part of article 1856, R. S. 1925.

We think that under Sovereign Camp, W. O. W. v. Patton et al., 117 Tex. 1, 295 S. W. 913, judgment can be here rendered, and which was rendered, though on different grounds.

Judgment is here rendered for appellees; that is, the judgment rendered by the trial court is affirmed.